JOHN BARNETT, appellant, *and* THOMAS V. JOHNSON, respondent.

When the Morris Canal Company take land under their charter the whole present interest is vested in them, and that whether they take by condemnation or by deed.

In such case the prior owner has no interest in the land taken by the company ·which he can protect by injunction.

Two classes of rights, originating in necessity, spring up coeval with every highway ; the first relates to the public passage ; the second, equally perfect, but subordinate to the first, relates to the adjacent owners. Among the latter is that of receiving from the public highway light and air.

The Morris canal is a public highway. It is not the less a highway because of the tolls and by reason of its being subject to the regulations of the company.

Owners of land adjacent upon the Morris canal have the privilege of receiving from it light and air ; provided, in so doing, they do not interfere with the most convenient use of the canal as a public highway, or with any of the regulations of the directors made *bona fide* for that purpose.

he complainant owned a lot in the city of Newark, adjacent upon the line of the Morris canal, and built a house touching the line, with windows facing the canal. *Held*, that this court will restrain the defendant, holding under the company, from erecting a building over the canal so as to shut ·up the complainant's windows.

Upon the filing of the complainant's bill in the Court of Chancery, an injunction was granted *ex parte.* The defendant, having filed his answer, moved to dissolve. This motion was argued before Mercer Beasley, esquire, master, &c., to whom the matter was referred by the Chancellor, (Williamson) he having been of counsel with the defendant in relation to matters contained in the bill. Upon recommendation of Master Beasley, the Chancellor made an order dissolving the injunction. From this order an appeal was taken.

*F. T. Frelinghuysen,* for appellant.

*O. S. Halsted,* for appellee.

The opinion of the court was delivered by

VREDENBURGH, J. The complainant in the Court of Chancery, who is also the appellant in this court, owns a house and lot in the city of Newark binding on the east upon Broad street, and on the south upon the Morris canal. Over this last the defendant, under a license from the canal company, proposes springing an arch, and erecting a building,

several stories high, touching the house and shutting up the windows of the complainant.

An injunction is prayed.

The company was chartered in 1824. In 1828 and 1830 they located and constructed the north side of their canal upon a portion of the south side of the complainant's lot, to wit, a portion, in the shape of a wedge, three feet wide upon Broad street, and running back one hundred feet, to a point in the rear. The balance of the land wanted was obtained from other parties. After it was built, to wit, in 1832, the complainant erected his said house with several windows facing upon the canal.

In 1837 the proceedings, theretofore instituted under the charter to condemn this gore, being deemed imperfect, the company paid the complainant the consideration money, and he executed to them a release of all his interest in the same.

It is admitted that the building the defendant proposes to erect is not wanted for any purposes connected with the canal, or for the most perfect enjoyment by the company of all their corporate franchises.

The complainant insists that he is entitled to relief.

*First.* Because whether the company hold this gore by condemnation or release, they acquire thereby only a right to construct their canal upon it, and to use it for canal purposes; that all other interests are reserved to himself; that this building would in fact be on his own, and not on the defendant's land.

*Second.* Because this canal is a public highway, and he the adjacent owner, and that he has thereby of common right the privilege of receiving light and air from it without this obstruction.

*Third.* Because, in 1832, he erected his said building upon the faith that the canal had been dedicated as a public highway by the company, and that thence a contract is implied that they would put it to no use inconsistent with that dedication detrimental to his building.

The company insist that they own the *locus in quo*, and have a right to do with their own as they please.

The complainant, to entitle himself to relief, must show not merely that the defendant had no right to put up this building, but also an actual affirmative right to prevent it.

*First.* What is the operation of the titles under which the company hold. this gore? Upon this point I am of opinion that the whole present interest is vested in them, and that, too, whether they hold under the condemnation or under the release. .

The 6th section of the charter enacts, that after condemnation, the estate, right, property, and interest in the premises shall immediately vest in the company, to be held as long as they shall be used for the purposes of said canal. The release, in terms, conveys the same thing for ever. It is still used, and if the defendant's building be put up, it would still continue to be used for the purposes of a canal. They would take by release certainly, if its terms were broad enough, as great an estate as they could by condemnation. If by condemnation the estate, right, property, and interest vested in the company, how could there remain any in the complainant? The charter vested in the company not merely a right to use it for canal purposes, but the entire estate, right, property, and interest in the premises as long as they shall be used for the purposes of the canal. Whether the company then hold under the one or the other, the complainant can have no present interest, estate, right, or property in this gore as owner or possessor. He has parted with the entire fee. He has given a deed for these interests and received the purchase money. To maintain that he still has any, would be to enable him to retain that for which he has been paid. It would deprive these conveyances of their ancient force, and of the very force which the charter expressly declares they shall have, and which, so far as I am aware, universal usage has always given them. It would be retaining in the grantor uncertain and indefinite rights, against the express language of the grant, as well as against the express statutory enactment. It would disenable every turnpike, railroad, plank road, canal, and, indeed, every cor-

poration which holds land by statute or by contract, from putting up any building or improvement upon their lands, or using them for any purpose, except what could be shown as strictly necessary for the enjoyment of their corporate rights, and that, too, when it would do no injury to the grantors. To so construe the conveyance in this case would be to enable the complainant to do the very thing of which he now complains, and to annoy others, instead of being annoyed himself; for if the defendant cannot erect this building because of an interest retained as between these parties, the complainant certainly can. It appears to me that the fee to this gore is in the company, and that, as between them and the complainant, they can do with it as they please, so long as they do not abandon it for the purposes of the canal.

If the complainant can therefore enjoin the defendant, it is not by virtue of his being or having been the owner of this gore. He must show some other affirmative right, and to this end he insists—

*Secondly.* That the canal is a public highway, and he the adjacent owner, and that, as such, he has of common right the privilege of receiving from it light and air.

This leads to two inquiries.

*First.* Is the Morris canal a public highway?

*Second.* If it is, has the complainant, as an adjacent owner, the right of receiving from it light and air.

*First.* Is the Morris canal a public highway.

The 25th section of the charter enacts that the said canal, when completed, shall for ever thereafter be esteemed a public highway, free for the transportation of all produce, &c., upon payment of the tolls, &c.

It has been completed many years, and is now still in full operation. It is therefore, by express legislative enactment, a public highway. Is it not also so in its intrinsic nature? A public highway is defined to be a public passage common to all the people. There are various kinds of them, differing in their origin, their mode of construction, the vehicles and motive power used upon them, the cheapness and speed with

2 s

which they may be travelled upon, and on that account requiring and subject to different police and municipal regulations, but all agreeing in what constitutes them public highways, *viz.* in being public passages common to all the people. Oceans and seas are the highways of nations; arms of the sea and navigable rivers are the highways in or between different states; our common roads, turnpikes, canals, plank roads and railroads, as generally used and constructed, either directly or indirectly by the sovereign power, or recognized by it, are equally, however differing in their mode of uses, public passages common to all the people.

This act of incorporation is entitled an "act to form an artificial navigation between the Passaic and Delaware rivers." It gave the company the power to build it, and to all the people the privilege to use it upon paying the tolls. The state did not deem it expedient to construct the work itself, but constituted the company its agents for that purpose. It paid the corporators with the tolls. The consideration to the state for its grant of franchise was the advantage to the people from the construction of this improved highway. The company accepted the charter, built the work, and dedicated it to the public as a highway.

It is not the less a highway because of the tolls—they are only an equitable mode of raising the taxes necessary to its construction and repair—nor on account of its being subject to the regulations of the company, requiring that passengers and merchandise should be received only at certain points— nor on account of any other regulations of the directors, because all these are only to make it not less, but more of a highway, a more perfect public passage common to all the people. If a common road is a public highway because it is a public passage common to all the people, is not the canal much more so? Where one person or one ton of merchandise passes over the common road, do not fifty pass over the canal?

The canal is therefore, by its nature, by long use, by dedication, and by express statutory enactment, a public highway.

*Second.* Has the complainant, as adjacent owner upon this highway, of common right the privilege of receiving from it light and air? If he has the right, it is not of much consequence how it originated, or by what name we may call it. For want of a better, I shall call this supposed right, as it was called by one of the counsel, *the right of adjacency.* Rights of this kind exist by as natural a law as the rights of occupancy.

A man's first instinct is to hold fast that which he has, his next, to seize that which is nearest to him. This idea is recognized in its broadest sense by the law of nations, in conceding to every independent community the control over the tide waters which surround its shores. The lords of the land are the lords of the circumjacent seas. All riparian rights are but instances of the same general law.

The question before us is not whether this canal company may not be its own riparian owner, nor what the company or public may do on the dedicated land by virtue of their eminent domain or for the purposes of a highway—nor is it a question as to the powers of a company to regulate according to their discretion the whole and every question respecting the construction, repair, mode of use, and government of the canal. The question is clear of everything respecting the full enjoyment by the corporation of all the franchises connected with its creation. But the question is, what the private owner of the fee of a public highway may do on the dedicated land, not at and below, but at and above the natural surface of the soil. Whether the owner of the fee of the road-bed can, without any purpose to improve the highway, or of adding to its most convenient use in the mode its nature requires as a public passage common to all the people, build up walls on both sides of it several stories high, shut out the *media* of light and air from, and hermetically seal up the adjacent buildings put there since its construction.

There are, it appears to me, two classes of rights, originating in necessity and in the exigencies of human affairs,

springing up coeval with every public highway, and which are recognized and enforced by the common law of all civilized nations. The first relates to the public passage, the second, subordinate to the first, but equally perfect and scarcely less important, relates to the adjoining owners. Among the latter is that of receiving from the public highway light and air.

In the first place, has not the adjacent owner upon the " *alta regia via*," the ordinary public highway, of common right the privilege of receiving from it light and air? Universal usage is common law. What has this been? Men do not first build cities, and then lay out roads through them, but they first lay out roads, and then cities spring up along their lines. As a matter of fact and history, have not all villages, towns, and cities in this country and in all others, now and at all times past, been built up upon this assumed right of adjacency? Is not every window and every door in every house in every city, town, and village the assertion and maintenance of this right?

When people build upon the public highway, do they inquire or care who owns the fee of the road-bed? Do they act or rely upon any other consideration except that it is a public highway, and they the adjacent owners? Is not this a right of universal exercise and acknowledgment in all times and in all countries, a right of necessity, without which cities could not have been built, and without the enforcement of which they would soon become tenantless? It is a right essential to the very existence of dense communities. What must be the consequence to permit the accidental owner of a part or the whole of the road-bed to wall up or throw a thin curtain in front of the adjacent buildings, or by any other contrivance shut out from them the light and air? Suppose the owner of the fee should try the experiment to the east of the complainant's house, and wall up Broad street, would it be tolerated for a moment, or if enforced, would it not soon turn our streets into tunnels, and seal up cities in darkness?

If it be said that there are no cases sustaining this right, so there are none establishing this right to light and air at all or to the right of passage. It is a right founded in such an urgent necessity that all laws and legal proceedings take it for granted. A right so strong that it protects itself, so urgent that, upon any attempt to annul or infringe it, it would set at defiance all legislative enactment and all judicial decision. It is the mode by which the sovereign power, in the exercise of its eminent domain, since land has become the object of private ownership, "*ab imo usque ad cœlum,*" at the same time that it creates a right of passage, opens up and reserves to all, as the increasing density of the population demands it, the use of the common elements of light and air.

We cannot conclude otherwise than that a right so essential, so universal in its exercise in all time and among all nations, exists, not, as was said in the case of *Gough* v. *Bell,* 2 *Zab.* 441, by a common law local to New Jersey, but by a law common to the whole civilized world.

If this right exists with respect to the ordinary highway, does it not exist with respect to this canal company?

It might, perhaps, be sufficient to say to this, that from time immemorial before the passage of this charter, the adjoining owner upon every public highway had of common right the privilege of receiving from it light and air, and that this canal, by its intrinsic nature, by long uses, by dedication, and by express statutory enactment, was such highway.

Why should this canal be an exception to this general rule? Does the complainant's receiving from it light and air at all interfere with its being a highway, or its most perfect and full operation or its police regulations in the slightest degree impair its convenient and profitable use? Did not the legislature intend it should be a public highway in the usual acceptation of the term? Must we not say they did, unless it appears upon the face of the charter that they did not? The right of adjacent owners to light and air from

the public highway was at the time of the enactment of this charter as well known as universally acknowledged a right as necessary to the public interest as the right of public passage itself. Can we assume that the legislature meant it should be a highway for some purposes and not for others?

When they declared it such, did they not intend that it should be a highway to all parties brought in relation to it? Can we assume that they intended it should be a highway for the purpose of having the immunities of the highway, and not to furnish all the advantages of its being such? That it should be a highway in being protected from nuisance, and not a highway for the purpose of affording breathing room for the increasing population which through all succeeding times might dwell upon its banks.

Our turnpike charters generally provide for taking the entire fee, but have no clause declaring them to be highways. The legislature seem to have thought that their nature sufficiently declared them to be such.

In the charters of our canals, rail and plank roads, they are generally declared to be such. Are we to declare, with respect to all these, that they are highways only for the purpose of public passage, and that the accidental owner of the fee of the road-bed, whether such owner be the company or a private individual, can in all these cases, for no purpose connected with the public right of passage, shut up the doors and windows of all the adjacent houses "*ex vi termini?*" When a strip of land is declared a public highway, the adjoining owner has a right to light and air from it. The column of light and air above the road-bed, whether of land or water, is as much part of the highway as the road-bed itself. Take them away, and there would be left no public passage. By its being declared a highway by the sovereign power, the light and air above it become again the common property of all, which all may breathe and use whenever they may legally touch it, whether in the road or along its sides. What good reason exists why this kind of highways should differ in this respect from the ordinary ones? This

right to receive light and air is subordinate to every purpose connected with the full enjoyment of public passage. The same necessity exists for it here as in that of the ordinary highway. It is the common understanding of the public. A very large proportion of the towns and villages in the state are built up along them. The facilities they afford soon give rise to all kinds of improvement along their lines; very large amounts of property soon become invested upon the assumption of these rights, and they are increasing in an increasing ratio year by year. Can we say that it was not to secure these very interests, among others, that the legislature declared that they should be esteemed public highways? No harm can arise, as I can see, from recognizing the existence of this principle as regards all our highways, those built by corporations as well as those built by the state. It does not interfere with, for it is subordinate to the exercise by the corporation of all its corporate powers and the enjoyment of all its corporate rights. It yields to the right of passage and to all rules and regulations made "*bona fide*" for its greater safety and convenience. The adjacent owners wi l not be perplexed with questions as to who owns the road-bed, or whether this one owns half, or a quarter, or the whole. Each one gets what he is entitled to, *viz.* the light and air from the whole highway, and not to a half, or, as would be the case with this complainant if he had to depend solely upon his owning the gore, an *infinitesimal* portion of it.

In case the canal, turnpike, or railroad ceases to be such the public highway still continues. The streets, villages, and towns that have been built up along their lines cannot be sealed up in darkness by whoever may be the accidental owner of the road-bed until it is legally vacated. When streets and villages have been built up along a public highway the right to light and air from it become vested, and even the legislature would have no more right to deprive them of it without compensation than they would to draw off the water from a navigable stream. The legislature have declared this canal a public highway. Why should we

abridge the term of its accustomed force? Why annul at one sweep, now and for all time to come, the right to building front and breathing room upon all the turnpikes, canals, plank and railroads in the state, and give to whoever may be the accidental owner of the fee the right to shut up in darkness all the structures along their lines?

I am of opinion that the Morris canal is a public highway, declared so by the legislature, among other things, to create and protect these rights of adjacent owners, and that the complainant, as such, has of common right the privilege of receiving from it light and air, and consequently is entitled to his injunction.

This makes it unnecessary to consider the complainant's third ground, *viz.* that the company, as owners of the road-bed, have dedicated it, and that thence springs an implied contract that he will not shut off the light and air. This appears to me but a different statement of the right of adjacency. The complainant can only raise the contract upon the existence of his right as an adjacent owner. He has no interest in the road-bed; and if he has no rights as adjacent owner, the law could raise no implied contract that those rights should not be disturbed. His right is still that he owns the land adjoining upon the highway, and does not depend upon who owns the whole or fractions of the road-bed, or how it was made a highway, whether by private dedication or by public authority, but upon the simple fact that it is a public highway, and he the adjacent owner.

The order of the Chancellor dissolving the injunction was reversed by the following vote:

*For affirmance*—None.

*For reversal*—Judges ARROWSMITH, HAINES, POTTS, VALENTINE, CORNELISON, HUYLER, RISLEY, VREDENBURGH, GREEN (Chief Justice), OGDEN, RYERSON, and WILLS—14.

The cause was thereupon remitted to the Court of Chancery, where an order was made for a perpetual injunction against the plaintiff.

NOTE.—The reporter is indebted to James Wilson, esq., for a copy of the above opinion, which, although pronounced at the term of November, 1856, has never before been printed, and it was considered of sufficient interest and importance to justify its publication at this time.